Opinion delivered June 25, 1886.

[No. 5108.]

DOC SIMS *v.* THE STATE.

1.  PRACTICE.—NEW TRIAL should be awarded when, from the evidence ad-duced on the trial, it appears that the absent testimony to secure which the defense applied for a first continuance, was material, and probably true.  See the opinion and the statement of the case in illustration.

2.  SAME—THEFT—SWINDLING—INDICTMENT.—The fact that an indictment for swindling alleges facts which would constitute the offense of theft, does not vitiate it as an indictment for swindling.  By the same act, in this case, the defendant may have committed both theft and swindling, and the State had its election to prosecute him for either offense, but a

conviction for one of the offenses would bar a prosecution for the other. See the statement of the case for the charging part of the indictment.

3. Same—Former Acquittal.—See the opinion *in extenso* for the substance of a plea of former acquittal, *held* insufficient because the alleged acquittal was for a different offense than that charged in the indictment in the present case.

Appeal from the District Court of Eastland. Tried below before the Hon. T. B. Wheeler.

A term of five years in the penitentiary was assessed against the appellant, upon his conviction for swindling, under an indictment, the charging part of which reads as follows:

* * * * "That Doc Sims, late of said county, on or about the twenty-fifth day of May, A. D. 1884, and in said county and State of Texas, did then and there, by means of false pretenses and devices, and fraudulent representations, then and there knowingly and fraudulently made by him to G. C. Fort, did induce the said G. C. Fort to deliver to him, the said Doc Sims, and the said Doc Sims did then and there, and by the means aforesaid, acquire from the said G. C. Fort a certain horse of the value of ($100) one hundred dollars, the same being the personal and movable property of the said G. C. Fort, with the intent to appropriate the same to the use of him, the said Doc Sims; in this, to-wit: the said Doc Sims did then and there falsely pretend and fraudulently represent to the said G. C. Fort that he, the said Doc Sims, was then and there the owner of four (4) certain cattle, to-wit: four (4) work oxen, and had the right to dispose of the same, and did, thereby, then and there, fraudulently induce the said G. C. Fort to exchange his said horse for said cattle, and then and there deliver the said horse to the said Doc Sims, when in fact and in truth the said Doc Sims did not own the said cattle, and did not have the right to dispose of the same; and the said Doc Sims then and there knew that said pretenses and representations so made by him to the said G. C. Fort were false; against the peace and dignity of the State," etc.

G. C. Fort was the first witness for the State. He testified that in May, 1884, he lived near Rising Star, in Eastland county, Texas. To the best of the witness's knowledge he had seen the defendant on three occasions prior to the day of this trial. He first met the defendant on the twenty-third day of May, 1884, about three miles above his, witness's, house. Defendant was

then driving a yoke of oxen along the road. Witness asked him if he did not want to trade the oxen. He said that he did, and that he had just been down to Rising Star to see if he could not sell them to old man Fort, but that Fort had bought some oxen and did not want his. He added that he had still another yoke of oxen which he wanted to sell, which yoke he had left at Fort's ranch. Witness then proposed to trade him a horse for the oxen, and to pay in money whatever difference they might agree upon. Witness told the defendant that he had to go to the store, and that if defendant would wait for witness, they would go to the house, and thence to Fort's ranch to look at the other yoke. Defendant awaited witness's return from the store, went home with witness and dined with him, and the two after dinner went out to witness's lot, and witness told him that if the yoke he had at Fort's ranch were as good as a pair of steers witness had at the lot, the trade could be made, and he could leave the yoke he was driving. Defendant, after examining witness's steers, said that his absent yoke were as good or better than witness's. The terms of the trade, conditioned that the yoke of oxen at Fort's were as good as represented, were then agreed upon. Witness was to give his horse and thirty dollars in money for the two yoke, the thirty dollars to be paid in a few days. Witness and defendant went that evening to old man Fort's ranch. Witness decided that the steers were inferior to his own, and defendant agreed to a reduction of five or ten dollars of the deferred payment. Defendant then executed and delivered to the witness the bills of sale, which read as follows:

"BROWN COUNTY, TEXAS, May 23, 1884.
" Know all men by these presents, that I, T. F. Smith, have this day bargained and sold to G. C. Fort, the following described steers, to-wit : One red steer, speckled sides, marked under half crop and over half crop each " year," branded thus, (2 with a half circle over it), left side; thus, (O with a bar under it), left hip; also one red steer, nine or ten years old, marked crop and two splits right, over half crop left; branded thus, 1y, left hip. The title to said steers I warrant and defend.
" T. F. SMITH."

"BROWN COUNTY, TEXAS, May 23, 1884.
" Know all men by these presents that I, T. F. Smith, have this day bargained and sold to G. C. Fort, the following described

oxen, to-wit:  One yoke of five year old steers, one brown, one red, marked a crop and two splits each ear, branded thus ·—H— on the left side; also thus, LLB, on left hip.  The title to said steers I warrant and defend.

. " T. F. Smith."

["Exhibit A.    Filed March 10, 1886.

"R. M. Black, County Judge."

Witness received the oxen and delivered the horse to the defendant, but could not remember whether or not he executed a bill of sale to the horse.  Defendant was to meet witness ten days later at Crosscut, and receive his money payment.  He failed to appear at Crosscut at the appointed time, but came to witness's house four or five days later.  Witness asked him what he had done with the yokes and chains included in the sale.  He said that he used them in moving camp for a friend; that he left them in the new camp intending to bring them to witness, but that they were stolen over night.  He then proposed a reduction of the value of the yokes and chains from the money payment due.  Accordingly nine dollars was deducted, and witness paid him the difference in money.  Witness did not see the defendant again until he saw him in the Eastland county jail  At their first meeting the defendant told witness that his name was T. F. Smith.  Witness gave the defendant a gray horse worth one hundred dollars.  He was branded Z on the left shoulder.  Defendant claimed the —H— brand as his, and that it was recorded in Hill county.  He claimed to have owned the yoke of young steers since they were two year olds.  Witness sold one of the oxen, and the other three he turned over to Mr. Lieb, who proved them as his property, together with a steer to replace the one sold.  Mr. Lieb's son first came into witness's neighborhood looking for the oxen.  He identified one of them yoked to a wagon, and described the others to the witness.  Mr. Lieb then came to witness's house, made an affidavit of ownership, and got the animals.

Cross examined, the witness testified that he felt morally certain that the defendant on trial was the man who traded him the oxen for the horse.  Defendant was made and built like and looked like that man, and to the best of the witness's knowledge and belief, he was the man.  Witness could not swear more positively to defendant's identity.  Witness's wife was present at intervals during the two visits of the alleged T. F. Smith. · The

horse was now in the possession of old man Gainsts, who raised him. Gainsts lived some ten or twelve miles distant from the witness. The horse was in Gainsts's possession when witness first saw him after the trade with the alleged T. F. Smith. Witness kept the oxen from the twenty-third day of May, 1884, until some time in December, 1885. Lieb told witness that he lived in Shackelford county, and brought the witness a certificate to that effect from the county clerk of Shackelford county. Witness did not know the distance from his house to Shackelford county.

Mrs. Fort, the wife of the witness G. C. Fort, testified, for the State, that the defendant was the man who, under the name of T. F. Smith, traded the oxen to her husband for a horse. He was twice at her husband's house. He dined there on the occasion of his first visit. When he came to the house the second time to collect the delayed payment due him on the purchase of the oxen, he remained at the house an hour or more. Witness was positive as to the identity of the defendant and the pseudo T. F. Smith.

August Lieb testified, for the State, that he lived in Shackelford county, Texas. On or about May 14, 1884, witness lost two yoke of oxen, of color, marks, and brands corresponding with the bills of sale executed by T. F. Smith to G. C. Fort. The animals were taken from the witness's possession without his consent and without his knowledge. They were taken from the witness's ranch in Shackelford county, and in January or February, 1886, three of them were found in the possession of Mr. G. C. Fort, in Eastland county. Mr. Fort reported that he had sold one of them. Witness made an affidavit of ownership, and recovered the three animals from Mr. Fort, and got another one in the place of the one Fort had sold.

The defendant came to Shackelford county in the fall of 1883, and settled on a place about one and a quarter miles distant from witness's house. Witness knew him under the name of "Doc Sims." He left that neighborhood in February or March, 1884, and had never been back there, so far as the witness knew.

Cross-examined, the witness testified that he was present at the September term, 1884, of the district court of Shackelford county, when the defendant, as Doc Sims, was tried and acquitted upon an indictment which charged him with the theft of eight head of the witness's cattle. The eight head alleged in that indictment included the three head recovered by the witness from Mr.

Fort. Defendant had no authority from the witness to trade the cattle. Witness, in the fall of 1884, saw the defendant in possession of an iron gray horse branded Z on the left shoulder. Defendant, on that occasion, passed the witness's house with the horse tied behind his wagon. He passed at a distance of fifteen hundred steps or yards from the witness. Witness afterwards heard the defendant's mother making inquiries about the whereabouts of the horse. Jack Fielder afterwards had possession of the horse in Norcup's pasture.

Mrs. Caroline Lieb, the wife of the witness, August Lieb, testified, for the State, that she became acquainted with the defendant late in the fall of 1883. Some time after that, witness, while washing at a spring near her house, saw the defendant and one George Brooks driving a bunch of about forty cattle, which bunch included eight head which belonged to witness's husband. They passed the witness at a distance of about one hundred and fifty yards. Witness recognized her husband's cattle at that distance by their brands and calves. The spring at which the witness was washing when she saw defendant, Brooks, and the bunch of cattle, was in a hollow, and was enclosed on three sides by high bluffs. One side was open, and it was through that opening that she saw the cattle and defendant and Brooks. Witness went alone to the house of the defendant on the night of December 24, 1884. She did not, on that occasion, in the presence of Mrs. M. N. Daniel and the defendant's family, say that her husband forced her to swear against the defendant on his recent trial for the theft of the cattle. Witness went to the defendant's house on the night of December 24, 1884, because she was lost. She had come from Albany that day in a wagon with her husband, who was drunk. The witness refused to tell why she left her husband and the wagon.

B. F. De Rossett testified, for the State, that in the spring of 1884 he lived in Cisco, Eastland county, Texas. The witness had frequently seen the defendant, but had no special acquaintance with him. Witness first saw him on the edge of Comanche county, on the fourth or fifth day of June, 1884. He was then riding a large, iron gray horse. The brand on the horse was very dim, and witness thought that it was an N or an S lying lengthwise. The witness did not examine the horse critically, but observed that he was a very good animal. Witness separated from defendant, and saw him again between two and four hours later, just as he was going into camp three or four miles from

Comanche. Two men rode off from the camp as the witness rode up to it. Defendant gave their names as Johnson and Brooks. Defendant asked witness if he was going to Comanche. Witness replied that he was, and the four—witness, defendant, Johnson, and Brooks—rode into town together. They had three teams of mules and horses, but no oxen, and were traveling towards Brownwood. Sheriff Cox, of Comanche county, advised witness to follow them. Johnson had stolen a wagon at Cisco, and the witness was then under the impression that Johnson and Brooks had stolen his horse. Johnson was afterwards sent to the penitentiary for the theft of the wagon, and Brooks was killed by the rangers near Brownwood. Several parties, including witness, missed property about the time the wagon was stolen by Johnson. The rangers arrested the defendant in Brownwood, and required him to conduct them to his camp, which he did with apparent willingness. The camp was searched and the defendant released. Witness next saw the iron gray horse pass through Cisco, tied behind a wagon driven by the defendant, who, with his family, was then on his way to Eastland to attend Johnson's examining trial.

Z. T. Brooks testified, for the State, that he resided in Comanche county, Texas. On or about June 1, (1884?) the witness saw the defendant and two other men calling themselves Johnson and Brooks, in camp on the Comanche road. A large, iron gray horse was then tied near the camp. Defendant did not seem to be exercising any more control over that horse than the other men did. The State closed.

N. Thompson was the defendant's first witness. He testified that he divided his time between his home place in Anson, Jones county, Texas, and his sheep ranche, which is located near the house of A. Lieb in Shackelford county, Texas. He knew the reputation of A. Lieb for truth and veracity, and knew it to be bad. He had never heard any one say that Lieb would swear to lies, but he knew that the majority of the people of the neighborhood regarded his reputation for truth as bad.

J. W. Savage, principal of the Abilene school, testified for the defense that, basing his knowledge of A. Lieb's general reputation for truth and veracity upon information derived from a majority of Lieb's neighbors, he would pronounce it bad. Witness harbored no ill feeling towards Lieb, notwithstanding Lieb once denied witness's knowledge of about two hundred head of his, witness's, sheep, which strayed from his flock and got

mixed with Lieb's sheep. Witness recovered his two hundred sheep.

Mrs. M. N. Daniels testified, for the defense, that Mrs. Caroline Lieb was at the house of her brother, the defendant, in Shackelford county, Texas, on the twenty-fourth day of December, 1884. On that occasion she told defendant, in the witness's presence, that she would not have testified against him at his recent trial, but that her husband, A. Lieb, forced her to do it. She was terribly bruised and beaten up, and said that she had fallen from a wagon and got lost.

B. F. Cotton testified, for the defense, that, in February, (1885?) he was employed by defendant to represent him as counsel upon his examining trial under a complaint charging him with the theft of two yoke of oxen. Defendant, at that time, was in the Eastland jail. Witness saw him solitary and alone in the jail, and asked him about his fee. Defendant said that his mother would pay the witness his fee, and suggested that if the witness would get him a sheet of paper he would write her to send the witness the amount of his fee. Witness went to the sheriff's office, got one of the sheriff's letter heads and took it to the defendant. Defendant told witness to call for the letter within thirty minutes. Witness returned at the appointed time, and defendant passed him a letter through the grating, and told witness to send it for him. Witness read the letter and mailed it to the defendant's mother at Patrick post office, McLennan county, Texas. Defendant's mother came to Eastland afterwards, and brought the defendant some money. Witness identified a letter in evidence as the letter written by the defendant.

Jack Fielder testified, for the defense, that he had corresponded with the defendant for a long time, and knew his hand writing perfectly. The letter in evidence, and identified by the witness Cotton, was in the genuine hand writing of the defendant.

Judge Josiah Boone, as an expert, testified, for the defense, that the bills of sale to T. C. Fort signed "T. F. Smith," and the letter in evidence proved to have been written by the defendant, though some of the letters were feebly similar, were, most positively, written by different persons. The orthography and grammar of the bills of sale were infinitely superior to those of the letter. The man who wrote the letter could not have written the bills of sale. Both instruments were genuine, and not disguised hand writings.

B. B. Truly, as an expert, testified substantially as did the witness Boone.

Jack Fielder, recalled for the defense, testified that defendant and George Brooks resembled each other to a remarkable degree. The distance from Cross Plains to the Clear fork of the Brazos river, where A. Lieb lived, was between sixty-five and seventy miles.

Esquire Coffman testified, for the defense, that he lived about three miles from Cross Plains, in Callahan county, Texas, and had been justice of the peace for that precinct since 1882. Witness had a slight acquaintance with the defendant in the spring of 1884, since which time the defendant had changed very much in personal appearance. Defendant came to witness's house on the sixteenth day of May, 1884, in company with some other men, who came to post an estray horse. Defendant's visit was made to prevent the witness from solemnizing a marriage between a lady relative of his, defendant's, and one George Brooks. Witness located the date positively by the record he made estraying the horse. Defendant was then camped in the neighborhood near G. W. Bell's place, and had been in the neighborhood about a week. Witness did not know how long after May 16 defendant remained in that neighborhood. From Cross Plains to Albany, in Shackelford county, the distance is fifty miles.

G. W. Bells testified, for the defense, that in the spring of 1884, the defendant and his family camped near his house. Witness could not recall the month. He remembered that during that time defendant went to Esquire Coffman to prevent the celebration of the marriage of a young girl and one George Brooks. Defendant had then been camped near witness's place fully a week, and remained in that camp fully two weeks afterwards. Witness saw him at least twice every day during the said three weeks.

The defendant's application for a continuance was based upon the absence of six witnesses. The application alleged that by three of them the defendant expected to prove that, on the twenty-third day of May, 1884, the defendant was with them near Cross Plains, and near G. W. Bell's residence, and that he neither had the oxen in his possession nor under his control. By two of the other witnesses he expected to prove that he bought the horse in question from George Brooks, and by the remaining witness that he was not the party who traded the oxen to G. C. Fort for the horse.

*J. T. Hammons* and *B. F. Cotton,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   Defendant's first application for a continuance, grounded upon the absence of witnesses whose testimony is alleged to be material to his defense, shows that he used legal and sufficient diligence to obtain said testimony.   The application, in other respects, complies fully with the requirements of the law.   There can be no question but that the absent testimony, as it is set forth in the application, was material to the defendant, and the evidence adduced on the trial does not render it improbable that it is true, but, on the contrary, tends to corroborate it.   We think the court erred in not granting the defendant's motion for a new trial, when it appeared from the evidence that the absent testimony was not only material to the defendant, but was probably true.

It was not error to overrule the exceptions to the indictment. It charges the offense of swindling in due form.   That the facts set forth in the indictment may have constituted theft, does not vitiate the indictment.   By the same act the defendant may have committed both theft and swindling, and the State had its election to prosecute him for either offense, but a conviction of one would bar a prosecution for the other.

Defendant's plea of former acquittal was bad upon its face. It should have been, but was not, excepted to for insufficiency. It presented no facts which could operate as a bar to this prosecution.   It pleaded a judgment of acquittal of the charge of theft of cattle, while this prosecution is for an entirely different offense.   Defendant may have been innocent of the theft of the cattle, and yet guilty of the crime of swindling Fort out of his horse.   Or he may have been guilty of both offenses, because the two transactions were not the same.

Because the court erred in not granting the defendant a new trial upon the ground that it was developed on the trial that a continuance should have been granted him, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*